# Turner v. Cheltenham Township

106

*Daniel L. Quinlan, Jr.*, for plaintiffs.
*Samuel H. High, Jr.*, for township.

DANNEHOWER, P. J., May 22, 1958. This action in equity is a taxpayers' suit brought by residents and taxpayers of Cheltenham Township against Cheltenham Township, a township of the first class, to restrain and enjoin the collection of real estate taxes for the year 1957 in excess of 14.5 mills or such lower rate as needed to balance the budget, after including in available revenues in the budget those sums in the "Permanent Sewer Account" and "Permanent Improvement Account," set up by defendant, which were not appropriated to specific budgeted expenses of the current fiscal year.

The complaint avers that the commissioners of the township, for a number of years by a practice of underestimating its revenues and overestimating its expenses, have accumulated surpluses, that these surpluses have been transferred to unbudgeted "Permanent Sewer Account" and "Permanent Improvement Account," that notwithstanding these available surpluses in these two accounts, the township has increased its real estate tax for 1957 from 14.5 mills to 15.5 mills, thus ignoring these available surpluses, and have acted unlawfully and in violation of the First Class Township Code.

Defendant township filed a responsive answer denying its underestimated revenues or overestimated expenses, and denied that the funds in these two accounts represent surplus funds available for 1957 expenditures for general township purposes. It is averred, on the contrary, that the balance in these two funds represent the proceeds of bonds borrowed under law for permanent improvements and collections from sewer assessments which must be retained for such purposes as provided by law and therefore are not

funds which can or should be appropriated for general township purposes.

Thus, the following issue is raised:

(1) Were the funds in the "Permanent Improvement Fund" and "Permanent Sewer Fund" at the end of 1956 available and surplus funds to meet the budgeted expenditures of 1957 within the meaning of section 1701 of the First Class Township Code?

(2) Were the township commissioners compelled to include the balance on these funds in the budget to reduce the tax assessment?

The complaint in this case was filed on February 11, 1957, and the answer on March 12, 1957. The hearing was held on May 14, 1957, and the notes of testimony were not filed until September 13, 1957. Thereafter, plaintiffs filed a brief and requested findings on September 30, 1957. Defendant on November 7, 1957, filed its brief and plaintiffs filed a reply brief on December 11, 1957.

If the chancellor had been convinced that a restraining order was warranted, he would have issued one shortly after the hearing, but his preliminary judgment was that a restraining order was not justified and a longer time than usual was permitted to pass for deliberation on the issues involved. Since practically all the 1957 taxes in Cheltenham Township have been paid and collected, the question of issuing a restraining order is now practically moot. However, we will write an adjudication at this late date.

From the evidence and exhibits presented at the hearing, there are made the following:

### Findings of Fact

1. Plaintiffs are owners of real estate in Cheltenham Township and are taxpayers in that municipality.

2. Defendant, Township of Cheltenham, is a first class township in the Commonwealth of Pennsylvania.

3. In accordance with the provisions of the First Class Township Code, the commissioners of Cheltenham Township in preparing annual budgets made estimates of the income and revenue available to meet the budgeted appropriations for each year. This resulted in an annual realization of a surplus of income and available revenues over expenditures as follows:

| | Surplus | Transferred to Permanent Improvement Account | Transferred to Permanent Sewer Account | Balance as available for expenses for following year |
|---|---|---|---|---|
| 1952 | $248,000 | $ 50,000 | $ 90,000 | $108,000 |
| 1953 | 323,000 | 100,000 | 85,000 | 138,000 |
| 1954 | 289,000 | 75,000 | 75,000 | 139,000 |
| 1955 | 376,000 | 150,000 | 125,000 | 101,000 |
| 1956 | 292,000 | 70,000 | 105,000 | 117,000 |

Of these surpluses, the commissioners transferred certain portions to the two permanent funds as indicated above.

4. At the end of 1956, the balance in the "Permanent Improvement Fund" was $239,689 and the balance in the "Permanent Sewer Fund" was $106,389, a total of $346,078, which sum the commissioners failed to treat as funds available for general township expenditures for the following year 1957 and refused to include them in the budget.

5. If the balance in the two permanent funds of $346,079 had been included in the budget as available for 1957 expenditures, the tax rate of 14.5 mills might have been reduced by six mills, instead of being increased one mill.

6. The "Permanent Improvement Fund" was established in 1943 for various capital improvements including street and sidewalk construction, flood control, bridges, incinerator, township buildings, etc., when $50,000 on a default bond was deposited to the credit of this account. Various sums were added to this fund

from surplus. In 1950, $60,000 was expended for flood control, road construction, joint incinerator and new township building, and in May 1957, $50,000 was added from a bond issue. This fund has statutory authority in the Act of April, 30, 1943, P. L. 145, as amended, 53 PS §1431 et seq.

7. The "Permanent Sewer Fund" was established in 1947 and is maintained solely for sewer construction in the township. It originated from an $83,000 contribution from Abington Township for improvements to the sewer system, plus a $100,000 bond issue for permanent sewer improvements in 1951. This fund has statutory authority in the First Class Township Code of June 24, 1931, P. L. 1206, art. XXVI, sec. 2601, 53 PS §57601.

8. As to the "Permanent Sewer Fund," the commissioners did not credit this revolving fund with the full amount of the sewer assessment receipts; for instance in 1954, the collections were approximately $119,000, whereas only $75,000 was transferred from surplus; in 1955 receipts were $162,000, and only $125,000 was transferred; the commissioners could have transferred larger amounts from the surplus into this account.

9. Each of these funds is kept in a separate bank account.

10. Thus far in 1957, $29,400 has been disbursed from the Improvement Fund and $68,000 from the Sewer Fund. Ordinances have been adopted allocating $97,987 for township roads and an aggregate sum of $332,732 for sewer and general improvements. Among the projects pending in the township are the construction of a bridge, improvements to Cedarbrook Park, sidewalks along Limekiln Pike, Tookany Parkway and construction of an incinerator and reserve funds for flood control.

11. Taking into consideration the unbudgeted capital expenditures either planned or contracted for during the year 1957, a large portion of the funds in these two capital accounts are committed for payment.

## Discussion

By this action in equity, plaintiff taxpayers seek to enjoin the township from collecting taxes assessed on real estate in excess of 14.5 mills or in excess of such lower rate as might be required to balance the budget, after including in available revenues all such funds in the "Permanent Sewer Fund" and "Permanent Improvement Fund." Plaintiffs desire the chancellor to practically reduce the tax levy of 15.5 mills to 8.5 mills, claiming that the total sum of $346,078 in these permanent funds are surplus funds and available to meet the budgeted expenditures of 1957, within the meaning of section 1701 of the First Class Township Code, thus reducing the tax rate.

The township contends that these capital funds have statutory authority, that they are revolving funds for street and sewer improvement, lawfully transferred and repaid from surplus and need not be included in the budget.

Therefore the main issue is whether the funds in the "Permanent Sewer Fund" and "Permanent Improvement Fund" at the end of 1956 were "funds available," "revenues available for the year," "with all other sources of revenue," to meet the budgeted expenditures for 1957, within the meaning of section 1701 of the First Class Township Code.

It is the contention of the township that the "Permanent Improvement Fund" has statutory authority in the Act of April 30, 1943, P. L. 145, 53 PS §1431 et seq., for the creation of a capital reserve fund from surplus moneys in the general fund at the end of the year to be used for capital improvements and for re-

placement of, and additions to, public works and improvements and for deferred maintenance thereof.

As to the "Permanent Sewer Fund," the township alleges that under the First Class Township Code of June 24, 1931, P. L. 1206, and its amendments, 53 PS §57601, it has the right to create a revolving fund for street and sewer improvements, which may be begun by funds raised by issuance of bonds as a special tax not to exceed five mills and any assessments collected from the property owners shall be applied to the credit of said revolving fund.

The township also claims that the new amendment to the act, the Act of May 20, 1957, P. L. 180, 53 PS §56558, shows the intention of the legislature to permit the creation of capital reserve funds for anticipated capital expenditures for specific purposes and thus appropriate moneys from the general township funds.

While there are some technical and legal deficiencies in the origin and operation of both of these revolving funds, such as specially creating the funds, levying a special tax, failure of the municipality to annually show in its budget the amount of moneys in the special funds and crediting each fund with all of the assessments, nevertheless they are essentially such revolving funds as are provided and contemplated by the Township Code.

Plaintiffs have not questioned the honesty and sincerity of the township commissioners, nor the convenience, wise-planning or conservation of their budgetary practices. There is no doubt that such revolving funds have proved a great benefit to the township, notwithstanding they have not met with all the legal requirements. But even if the present system and practice is not strictly in accordance with the legal requirements, it does not follow that the current balance in these two accounts must accordingly be appropriated and made available for a reduction of taxes. There is

no doubt that the expenditures made from these two revolving funds were proper and reasonable and that the current balances are necessary for present sewer and general improvements now in progress. Such balances of $346,000, when viewed with the township's continuing program of capital improvements, is no surplus at all. It is clear that such revolving funds are not repositories for illegal accumulations of public moneys, but are funds used to finance legitimate, current, planned and necessary township projects. We might order defendant to adopt a new method of book-keeping and accounting, but this is not the relief plaintiffs have requested.

In any event, inclusion of these two accounts into the regular budget and the appropriation of $346,000 would add nothing to the township revenues, since that money would be applied immediately to sewer and general improvement needs. This sum would be immediately absorbed by current and contemplated projects for the present fiscal year, nothing would be available towards a reduction in taxes and the commissioners could levy a new or special tax.

The practice of a municipality in accumulating surplus funds through taxation is not per se unlawful or forbidden, if it is done in accordance with the Township Code.

It should be noted that the power to tax is a legislative function which will not be interfered with by the courts unless it is affirmatively proved that fundamental constitutional provisions or the statutory limitations and mandates are being violated. While an unnecessary accumulation of money in the public treasury is against the policy of the law, nevertheless the amount of money needed for the operation of a particular municipality should ordinarily be committed to the discretion of the taxing authorities in the exercise of their sound business judgment.

If the township commissioners would remedy certain legal requirement in the set-up of these two revolving funds, and show the amount of each special fund in the budget, plaintiffs' objections would wither away. Viewed realistically, a different system of accounting will not necessarily result in a reduction of taxes since planned sewer construction and public improvements must keep pace with the steady increase in building construction and population.

Under all the circumstances, especially at this late date when the 1957 taxes have been collected, plaintiffs are not entitled to injunctive relief against the 1957 tax rate and while there is some little merit in their complaint, it should be dismissed.

### Conclusions of Law

1. Equity has jurisdiction.

2. Defendant township has not unnecessarily accumulated money in the township treasury in violation of the First Class Township Code of 1931.

3. The funds deposited in the "Permanent Improvement Fund" and "Permanent Sewer Fund" are not funds available in totality for the budget needs of the fiscal year 1957.

4. Plaintiffs' complaint for injunctive relief against the tax rate for 1957 should be dismissed.

5. Costs should be paid one-half by each party.

### Order

And now, May 22, 1958, in view of the foregoing findings of fact, discussion and conclusions of law, it is ordered, adjudged and decreed that the following be entered

### Decree Nisi

Plaintiffs' complaint is dismissed: an injunction is refused. Each party to pay one-half of costs.

The prothonotary is directed to give notice as required by the rules of equity practice, that unless ex-

ceptions shall be filed within 20 days from this date, the decree nisi will become the final decree as of course.